USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/13/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WASHINGTON EDUARDO POLIT,

                          Plaintiff,

        -against-

GLOBAL FOODS INTERNATIONAL
CORPORATION,

                          Defendant.

------------------------------------------------------------------X

14-CV-07360 (SN)

OPINION AND ORDER

**SARAH NETBURN, United States Magistrate Judge:**

       On October 14, 2016, the Court entered a default for plaintiff Washington Eduardo Polit ("Polit") against defendant Global Foods International Corporation ("Global Foods"). On November 11, 2016, Polit submitted Proposed Findings of Fact and Conclusions of Law in support of damages, seeking a total of $59,561.82 in damages (as well as $19,003 in attorney's fees and filing costs), to which Global Foods failed to respond. The Court held an evidentiary hearing regarding Polit's damages on April 3, 2017. Because Polit has provided a sufficient basis on which to award damages and attorney's fees—albeit with reductions to each—the Court grants a total award in the amount of $30,603, in addition to pre-judgment interest.

## BACKGROUND

       Polit brought this action on September 11, 2014, alleging unpaid minimum wages and unlawful deductions from his salary in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the New York Labor Law, N.Y. Lab. Law § 650 *et seq.* ("NYLL"). On October 7, 2014, Global Foods answered the complaint and raised counterclaims against Polit, namely, that he breached his employment agreement and duty of loyalty by disclosing

1

confidential business information and trade secrets to third parties. Polit filed an amended complaint on November 25, 2014, claiming that defendant unlawfully retaliated against him by asserting the counterclaims.

The parties litigated the matter to trial, which was scheduled to begin on October 26, 2016. On September 23, 2016, defense counsel submitted an affidavit stating that Global Foods no longer wished to defend this case and would consent to an entry of default, with the understanding that a judgment would be entered against it following an inquest on damages. This Court entered default against Global Foods as to liability on each of Polit's claims on October 14, 2016. Polit submitted Proposed Findings of Fact and Conclusions of Law in support of damages, as well as various exhibits, on November 11, 2016. In addition to unpaid wages, Polit seeks damages for wage and hour notice violations, liquidated damages under the FLSA and NYLL, pre-judgment interest, and attorney's fees and costs. Global Foods did not submit a response. The Court held an evidentiary hearing on April 3, 2017, at which Polit testified.

## DISCUSSION

### I. Applicable Law

#### A. Default

Although "a default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability," it does not reach the issue of damages. <u>Bambu Sales, Inc. v. Ozak Trading, Inc.</u>, 58 F.3d 849, 854 (2d Cir. 1995) (quoting <u>Trans World Airlines, Inc. v. Hughes</u>, 449 F.2d 51, 69 (2d Cir. 1971)). In conducting a damages inquest, a court accepts as true all of the factual allegations of the complaint, except those relating to damages. <u>See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.</u>, 109 F.3d 105, 108 (2d Cir. 1997) (citing <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, 973

F.2d 155, 158 (2d Cir. 1992)). The plaintiff, however, must still substantiate his claim for damages with admissible evidence to prove the extent of damages. See Trehan v. Von Tarkanyi, 63 B.R. 1001, 1008 n.12 (S.D.N.Y. 1986) (requiring plaintiff to introduce evidence proving damages suffered before the court can determine whether relief flows from the facts (citing Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)).

Where the defaulting defendant does not make any submission on a damages inquest, a court must assess whether the plaintiff has provided a sufficient basis for the court to determine damages. See Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (a court should take the "necessary steps to establish damages with reasonable certainty"). A court may decline to award any damages where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, even though liability has been established through default. See, e.g., Griffiths v. Francillon, No. 10 Civ. 3101 (JFB)(GRB), 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012) (recommending that no damages be awarded because the motion papers alone were insufficient to support an award of damages), report and recommendation adopted, 2012 WL 1354481, at *1 (Apr. 13, 2012); Dor Yeshurim, Inc. v. A Torah Infertility Medium of Exch., No. 10 Civ. 2837 (JFB)(WDW), 2011 WL 7285038, at *5 (E.D.N.Y. Aug. 10, 2011) (same), report and recommendation adopted, 2012 WL 464000, at *1–3 (Feb. 10, 2012).

To assess whether plaintiff has articulated a sufficient basis for damages, a court has the discretion (but is not required) to hold a hearing to determine the amount of damages that should be awarded on a default. See Fed. R. Civ. P. 55(b)(2); Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989) ("[Rule] 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion of the district court."). The Court held a hearing on April 3, 2017, in

order to clarify the extent of Polit's damages. Counsel for Polit subsequently submitted supplemental documentary evidence and testimony in further support of his damages application.

### B. Federal and State Wage Law

An employee who brings an action under the FLSA for unpaid wages must prove that he performed the work and was not compensated properly for his time. See Grochowski v. Phx. Constr., Ypsilon Constr. Corp., 318 F.3d 80, 87 (2d Cir. 2003) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686–87 (1946)). At the same time, the FLSA requires an employer to "make, keep, and preserve" records of employee wages, hours, and employment conditions. 29 U.S.C. § 211(c). When records of wages, hours, and employment conditions are not kept by the employer, a plaintiff may meet his burden by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Anderson, 328 U.S. at 687; see also Kuebel v. Black & Decker Inc., 643 F.3d 352, 362 (2d Cir. 2011); Basquez v. Ranieri Cheese Corp., No. 07 Civ. 464 (ENV)(VVP), 2010 WL 1223606, at *8 (E.D.N.Y. Mar. 26, 2010) (an employee may "rely solely on his own recollections" if "documentation by the employer is inadequate, inaccurate, or absent altogether"). The NYLL also requires employers to provide annual wage notices to employees hired after April 9, 2011, and to provide each employee with accurate wage statements at the time wages are paid. See N.Y. Lab. Law §§ 195(1)(a) & (3); N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4.

## II. Liability

### A. Facts Related to Liability

In light of Global Foods' default, the Court is required to accept all of Polit's allegations as true, except for those pertaining to damages. See, e.g., Finkel v. Romanowicz, 577 F.3d 79, 84

(2d Cir. 2003) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)); Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993). Accordingly, the following facts are established as true.

Polit was an executive chef at Global Food's restaurant in Times Square in Manhattan. His general responsibilities included "menu creation, work the concept, hiring and training all the staff, and any other duties involved in the executive chef position." Polit Dep. Tr. at 15:20-23, attached as Ex. B to the Clark Declaration[1] (ECF No. 56-2). Polit was responsible for hiring kitchen staff and had firing authority. See Apr. 3, 2017 Tr. at 15:3-18. He supervised twenty to twenty-five people and set schedules and salaries for other employees. See id. at 15:22-25. He reported to Brian Young ("Young"), the Culinary Director of Global Foods at the time, and Steven Roberts ("Roberts"), the former CEO of Global Foods. See Feb. 1, 2013 Offer Letter, Ex. G (ECF No. 56-7).

Polit started working on January 16, 2013, as part of a team tasked with catering dinner events for investors and brainstorming the company's brand. See Polit Dep. Tr. at 21:7-13, Ex. B (ECF No. 56-2) ("Basically, I started working, they tell us to go and equip the kitchen and go to different meetings for concept and development and cook a few dinners for the investors, the owners of the building, and different people."); Apr. 3, 2017 Tr. at 6:18-24 ("We went immediately to work. We had to -- they wanted us to decide the name and the hiring. They want us to buy smallwares and some kitchen equipment to do some more entertaining, and we have to meet with the other members of the team. And all the other owners of the company were in New York; so we had to [] come and cook for them and then entertain them as well."). According to Vladislav Lipkin (the current CEO of Global Foods), with regards to the "brand and marketing meeting" that began on January 16, the new hires "met at the eventual pre-opening offices of

---

[1] All subsequent citations to the exhibits of the November 11, 2016 Justin S. Clark Declaration at ECF No. 56 will be referred to as "Ex. [] (ECF No. 56-[])."

Global Foods" to discuss "various scenarios" and possible names for the restaurant. Lipkin Dep. Tr. at 21:8-22-9, 29:19-23, attached as Ex. A to the Clark Letter[2] (ECF No. 61-1).

Polit testified that he and Global Foods agreed, in a December 2012 email exchange, to a start date of January 16, 2013, and an annual salary of $80,000. See Apr. 3, 2017 Tr. at 4:23-5:6. He stated, however, that he worked from January 16, 2013 to February 1, 2013 without any pay at all. Polit Dep. Tr. at 26:14-19, Ex. B (ECF No. 56-2); Apr. 3, 2017 Tr. at 6:25-7:5. Roberts emailed Polit on December 23, 2012, to invite him to a "two day company branding and marketing kickoff where you will participate in the creation of the DNA of the brand" on January 15 and 16, 2013. Email Between Clark and Roberts at 1, Ex. C (ECF No. 61-3). Roberts informed Polit on December 25, 2012, that "[w]hat I can do however is to bring you on in *February* as planned, but your *first month* would be paid at $3,000 (as opposed to your regular $6,667 monthly rate) for the *first four-week period* if that's of interest to you." Id. at 2. Although Polit could join in February "as planned," Roberts emphasized that "being present for the two day meeting [in January 2013] would be important for [Polit] to be involved in the initial concept branding and working with our creative marketing team." Id. On January 12, 2013, Roberts introduced Polit and Young, over email, to the company's marketing director, in case the director had questions "before our meeting next week." Id. at 4–5. But this email exchange did not indicate the rate at which Polit would be paid for starting "early" for the January 16, 2013 meeting.

An official offer letter, dated February 1, 2013, stated, "Your first day of employment will be no later than Monday, February 4, 2013, and you will be compensated at a rate of $80,000 per annum, payable on a bi-weekly basis, *except that, for the first 2 bi-weekly pay-*

---

[2] All subsequent citations to the exhibits of the April 5, 2017 Justin S. Clark Letter at ECF No. 61 will be referred to as "Ex. [] (ECF No. 61-[])."

*periods, your salary will be at half that rate*." Feb. 1, 2013 Offer Letter, Ex. G (emphasis added) (ECF No. 56-7). On February 4, 2013, Polit signed a wage notice form, which showed Global Foods' name and address but did not provide the rate of pay or the company's phone number. See Wage Notice, Ex. H (ECF No. 56-8). Polit was paid half of his $80,000 salary from February 4 to March 1, 2013. His salary was raised to $100,000 per annum, effective April 1, 2013. See 2013 Summary of Gross Earnings, Ex. D (ECF No. 61-4). He typically worked 40 hours per week. See Polit Decl. ¶ 3, Ex. C (ECF No. 56-3).

Polit did not receive any wage statements until May 3, 2013 (for the pay period ending on April 28, 2013). See Apr. 3, 2017 Tr. at 8:18-22. He did not remember receiving any information (either on or accompanying his wage statements) indicating Global Foods' full company name and contact information. The statements reflect that after April 28, 2013, he was paid on a weekly basis.[3] See Earnings Statements, Ex. I. (ECF No. 56-9).

On July 17, 2014, Global Foods terminated Polit's employment. Polit now seeks both unpaid minimum wage and unpaid wages (based on an $80,000 yearly salary) for the period from January 16, 2013 to February 1, 2013. He also claims that half of his salary was unlawfully withheld for the period from February 4, 2013 to February 28, 2013. He does not assert any unpaid wages with respect to the rest of his employment. See Apr. 3, 2017 Tr. at 12:10-19 ("Mr. Polit had testified during his deposition that his pay was fine after the February period ended.").

**B. Statutes of Limitation**

Polit brings his claim pursuant to the FLSA and the NYLL on September 10, 2014. The statute of limitations is six years under the NYLL and two years under the FLSA. See N.Y. Lab.

---

[3] The summary of Polit's gross earnings in 2013 (Ex. D (ECF No. 61-4)) shows that Polit was paid on a biweekly basis from February 3 to April 27, 2013, and then on a weekly basis beginning April 28, 2013.

7

Law § 663(3); 29 U.S.C. § 255(a). But if an employer's acts are found to be "willful," the statute of limitations under the FLSA increases to three years. See 29 U.S.C. § 255(a).

Polit He alleges that Global Foods' violations were willful, a fact the Court accepts as true given its default. See, e.g., Maldonado v. La Nueva Rampa, No. 10 Civ. 8195(LLS)(JLC), 2012 WL 1669341, at *3 (S.D.N.Y. May 14, 2012). Accordingly, Polit may recover for damages arising out of his employment going back six years under the NYLL and three years for damages arising out of the FLSA. Because all of his claims arise from January 16, 2013, when he first started working at Global Foods, they fall within the statutes of limitations.

## III. Damages

### A. Unpaid Wages

#### 1. January 16 – February 1, 2013

Polit alleges he was not paid at all for work performed during this period. He seeks minimum wage in the amount of $754 and unpaid wages in the amount of $4,000 (based on a yearly salary of $80,000). Polit, however, is not entitled to a double recovery of wages (i.e., both minimum wage and unpaid wages). Because the parties did not reach a negotiated salary with regards to the work Polit performed for the last two weeks of January 2013, the question before the Court is whether to apply the minimum wage, the negotiated half-pay rate agreed to for February 2013, or the negotiated annual salary of $80,000 that was paid starting March 4, 2013.

Because Global Foods failed to provide or maintain a complete set of pay records, the Court first reviews the record to confirm that Polit actually worked during the first two and half weeks of employment in January 2013. The evidence before the Court establishes that Polit worked from January 16 to February 1, 2013.

Polit's start date of January 16, 2013, is well-supported by both testimony and documentary evidence. See Apr. 3, 2017 Tr. at 4:2-10 ("But then in January, they come to me and they say they need me to start working earlier . . . So they told me to start working on January 16th. They sent me an e-mail and tell me to come to work on January 16th . . ."). A photo timestamped January 16, 2013, shows Polit working on that date at the "preopening for Global Foods." Jan. 16, 2013 Photo, Ex. F (ECF No. 56-6); see also Young Dep. Tr. at 27:10-25, Ex. B (ECF No. 61-2) (Young recognizing Polit in the photo). Furthermore, although the offer letter referenced a start date of February 4, 2013, the company's CEO at the time informed Polit in no uncertain terms that it would be "important" for him to attend the mid-January branding meeting. Email Between Clark and Roberts at 1–2, Ex. C (ECF No. 61-3). The CEO then introduced Polit over email to the company's marketing partner to resolve any questions before the meeting, further establishing that Polit was to start in January. Id. at 5. Polit testified credibly that he worked continuously from January 16, 2013 to February 1, 2013, including doing "some more entertaining," buying kitchen equipment, and hiring staff. Apr. 3, 2017 Tr. at 6:15-24.

Second, the Court reviews the record to assess whether the parties agreed to a rate of pay for the January term. Polit testified that, in December 2012, he and Global Foods had agreed on an $80,000 salary for work beginning on January 16, 2013. Polit Dep. Tr. at 5:2-6, Ex. B (ECF No. 56-2) (Mr. Polit: "I didn't have any offer letter at that time yet, but we agreed on a salary of $80,000, yes." The Court: "Okay. And did they say they would start paying you that salary starting January 16th?" Mr. Polit: "Yes. I mean, that was the salary that they agreed as it would be on, yes."). But the evidence submitted to the Court shows that, in the December 2012 email exchange between Polit and Roberts, the parties addressed only his salary for the "first month" (i.e., February 2013), which would be pegged at a $40,000 yearly salary. Email Between Clark

and Roberts at 2, Ex. C (ECF No. 61-3). Aside from the carve-out for February, his "regular $6,667 monthly rate" would apply. Id. The email did not address how much Polit would be paid for any work he performed in January. Thus, there is some evidence that the parties agreed that the annual salary of $80,000 would start in January, but it is not compelling. Accordingly, the Court finds that the parties did not negotiate a rate of pay for this period.

Finally, the Court performed its own review of the earning statements submitted as part of Polit's damages application in order to confirm that Polit was not paid anything for the period from January 16 to February 1, 2013. Determining whether Polit was paid was especially difficult in light of the fact that: (1) Polit did not receive any earning statements from before May 3, 2013, and (2) the earning statements for the first two pay periods in which he started receiving statements (specifically, the pay periods ending on April 28 and May 5, 2013) reflected multiple, different payments for the same pay period. Neither Polit's counsel nor the current CEO of Global Foods knew why Polit received multiple payments or which specific pay periods the extra payments corresponded to. See Apr. 3, 2017 Tr. at 9:23-25; Lipkin Dep. Tr. at 52:17-53:2, Ex. A (ECF No. 61-1).

The following facts guided the Court's analysis of Polit's earning statements. First, the document Bates-stamped "GFIC-4" in Exhibit I (ECF No. 56-9) is the first earning statement he received. This finding is supported by Polit's testimony that he did not start receiving statements until May 3, 2013. Second, Polit's weekly salary for the month of February 2013 was $769.23 (based on a rate of half the annual salary of $80,000, pursuant to the terms of his offer letter). His weekly salary for the month of March 2013 was $1,538.46 (based on his normal salary of $80,000). Third, Polit was given a raise in his yearly salary to $100,000 that took effect on the

pay period beginning on April 1, 2017. See 2013 Summary of Gross Earnings, Ex. D (ECF No. 61-4) ("Earnings increased to $100,000 eff 4/1/13 . . .").

The evidence establishes that Polit was paid a total of $18,846.51 for the pay periods ending on April 28, 2013, and May 5, 2013. See Earnings Statements at GFIC-4–7, GFIC-9–11, Ex. I (ECF No. 56-9). His normal compensation for these two weeks should have been $3,846.16, given that the $100,000 yearly raise had taken effect by that point. After deducting $3,846.16 from $18,846.51, Polit thus received an unexplained amount of $14,999.

Polit's earnings for February and March 2013 total $9,230.76. Deducting this amount from $14,999 leaves $5,769.23. Because his yearly raise of $100,000 took effect on April 1, Polit earned $5,769.23 for the first three weeks of April 2013, which corresponds precisely to the amount left over from February 2013, March 2013, and the two weeks of April 22 (ending on April 28) and April 29, 2013 (ending on May 5).[4] Therefore, it is established that he was not paid any money for the last two weeks of January 2013, as he alleges.

Polit seeks a total of $4,000 for this period (2.6 weeks at an $80,000 yearly salary). Because the parties failed to negotiate and agree upon a rate of pay for work performed in

---

[4] The Court's calculations are as follows:

| Weekly Pay Period | Salary Amount |
|---|---|
| 2/4 – 2/10 | 769.23 ([$80,000 ÷ 2] ÷ 52) |
| 2/11 – 2/17 | 769.23 |
| 2/18 – 2/24 | 769.23 |
| 2/25 – 3/3 | 769.23 |
| 3/4 – 3/10 | 1,538.46 ($80,000 ÷ 52) |
| 3/11 – 3/17 | 1,538.46 |
| 3/18 – 3/24 | 1,538.46 |
| 3/25 – 3/31 | 1,538.46 |
| 4/1 – 4/7 | 1,923.08 ($100,000 ÷ 52) |
| 4/8 – 4/14 | 1,923.08 |
| 4/15 – 4/21 | 1,923.08 |
| 4/22 – 4/28 (GFIC-4 through -7) | 1,923.08 |
| 4/29 – 5/5 (GFIC-9 through -11) | 1,923.08 |
| **TOTAL** | **$18,846.16** |

January, but did negotiate and agree that (1) generally his annual salary would be $80,000, (2) except in February it would be half that rate, it would be unfair to rewrite his contract to extend the period during which Polit agreed to half his salary. Global Foods could have amended Polit's subsequent offer letter to reflect a start date of January 16, 2013, and a halved rate for this time. But it did not. Thus, the Court is left with applying the minimum wage during this period or the negotiated and agreed-upon salary of $80,000 rate. Applying the minimum wage seems inappropriate given Polit's status and responsibilities as an executive chef and it would be an unfair windfall to Global Foods, who essentially forced its executive chef to work without pay. Accordingly, the Court adheres to the contractually negotiated salary of $80,000. Polit is entitled to an award of $4,000 for the work he performed from January 16 to February 1, 2013.

### 2. February 4 – February 28, 2013

Polit asserts that Global Food withheld half of his salary for the work he performed between February 4 and March 1, 2013. Polit's salary at this time was $80,000 per year or approximately $1,538.46 per week. He seeks $3,076.92 in unlawfully withheld wages for the month of February 2013.

But based on the evidence submitted, the Court sees no basis for awarding Polit additional compensation when Global Foods disclosed upfront that his salary for the first two bi-weekly pay-periods would be half of the $80,000 annual salary and Polit accepted this rate by accepting the position. See Feb. 1, 2013 Offer Letter, Ex. G (ECF No. 56-7); see also 2013 Summary of Gross Earnings, Ex. D (ECF No. 61-4) ("As per the Employment Agreement dated 2/1/13, Eduardo was supposed to receive a $3,076.92 bi-weekly, with the understanding that the first 2 bi-weekly periods (2/4/13-2/16/13 and 2/17/13-3/2/13) would be half the rate @ $1,538.46."). In addition, the email exchange between Roberts and Polit in December 2012

referred to a $3,076 salary for "the first four-week period," to which Polit did not express any objection. Email Between Clark and Roberts at 2, Ex. C (ECF No. 61-3). Polit has not demonstrated why this reduction in salary was an unlawful deduction or underpayment when he received sufficient advance notice that he would be paid precisely that amount. Therefore, Polit is not entitled to any unpaid wages for the period from February 4 to February 28, 2013.

### B. Liquidated Damages

Pursuant to the NYLL, a prevailing employee is entitled to liquidated damages in the amount of 100% of unpaid wages accrued unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law. N.Y. Lab. Law §§ 198(1–a), 663(1). Global Foods has not established that it had a good faith basis for believing that not paying its employee any money for work performed was in good faith compliance. Accordingly, for the period from January 16, 2013 to February 1, 2014, Polit is entitled to $4,000 in unpaid wages under the NYLL. Therefore, the Court orders a liquidated damages award of $4,000.

### C. Pre-Judgment Interest

Polit is entitled under the NYLL to pre-judgment interest at the statutory rate of nine percent per year. N.Y. CPLR §§ 5001, 5004. Pre-judgment interest applies to only the amount of actual damages awarded under the NYLL and excludes the amount of liquidated damages. See Xochimitl v. Pita Grill of Hell's Kitchen, Inc., et al., No. 14 Civ. 10234 (JGK)(JLC), 2016 WL 4704917, at *18 (S.D.N.Y. Sept. 8, 2016). Simple pre-judgment interest is calculated from a midpoint date. See Said v. SBS Elecs., Inc., No. 08 Civ. 3067 (RJD)(JO), 2010 WL 1265186, at *9 (E.D.N.Y. Feb. 24, 2010).

October 16, 2013, is the midpoint between Polit's start date of January 16, 2013, and his end date of July 17, 2014. As noted above, the principal amount he is owed in unpaid wages is $4,000. Therefore, a nine percent annual interest rate on $4,000 should be applied from October 16, 2013, through the date judgment is entered.

**D. Statutory Damages for the Wage Statement Violations**

Section 195(1)(a) of the NYLL, effective from April 9, 2011, to December 28, 2014, requires employers to provide all employees with a written notice "at the time of hiring" and "on or before February first of each subsequent year of the employee's employment," containing, *inter alia*, information about the employee's rate of pay, hours of employment, and contact information for the employer. N.Y. Lab. Law § 195(1)(a) (McKinney 2011). Section 195 applies to all private sector employees, including bona fide executive employees normally exempt from overtime requirements. Wage Theft Prevention Act FAQ, N.Y. State Dep't of Labor, at 5 ("Since Section 195 does not contain any exclusions or exemptions from the notice requirements, the notice requirements in Section 195 apply to all employees regardless of their exempt status.").

An employee may recover "damages of fifty dollars for each work week that the violations [of § 195(1)(a)] occurred or continue to occur," up to a maximum of $2,500, as well as costs and reasonable attorney's fees. N.Y. Lab. Law § 198(1–b) (McKinney 2011).[5] Polit alleges he was never given a "completed" notice pursuant to § 195(1)(a). The February 4, 2013 Notice and Acknowledgement bears Polit's signature but contains almost no relevant information, such as his pay rate, the basis of the pay rate, or the employer's contact information. See Notice and Acknowledgement of Rate of Pay, Ex. H (ECF No. 56-8); see also Apr. 3, 2017 Tr. at 17:14-25

---

[5] Effective February 27, 2015, the penalty under NYLL § 198(1–b) increased to $50 per day up to a maximum of $5,000, plus costs and reasonable attorney's fees. See N.Y. Lab. Law § 198(1–b) (McKinney 2015).

14

("It's missing information regarding the employer, in particular, the employer's address and telephone number . . . It appears to be missing the full name of the company, as well as the doing-business-as name . . ."). Accordingly, Polit is entitled to recover statutory damages of $2,500 for violation of § 195(1)(a).

In addition, § 195(3) of the NYLL requires employers to provide "a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof" to each employee. N.Y. Lab. Law § 195(3) (McKinney 2011). If an employer fails to provide a compliant wage statement, the employee may recover "one hundred dollars for each work week that the violations occurred or continue to occur," up to a maximum of $2,500, as well as costs and reasonable attorney's fees. N.Y. Lab. Law § 198(1–d) (McKinney 2011).[6] Global Foods did not provide Polit with wage statements until May 3, 2013 (for the pay period ending on April 28, 2013).

Taking January 16, 2013, as his starting date, Polit is entitled to recover statutory damages of $1,460 (14.6 work weeks). Therefore, he is awarded $3,960 in total for wage and hour notice violations.

### E. NYLL Unlawful Retaliation Claims

Polit seeks damages for retaliation claims under Section 215 of the NYLL, claiming that Global Foods brought its counterclaims solely to retaliate against him for commencing his civil action. Specifically, he seeks compensatory, punitive, and liquidated damages for retaliation in violation of Section 215, totaling $40,000.

---

[6] Effective February 27, 2015, the penalty under NYLL § 198(1–d) increased to $250 per day up to a maximum of $5,000, plus costs and reasonable attorney's fees. N.Y. Lab. Law § 198(1–d) (McKinney 2015).

But Section 215 requires that plaintiffs bringing any lawsuit under the anti-retaliation provision first serve notice of the suit upon the State Attorney General. See N.Y. Lab. Law § 215(2)(b) ("At or before the commencement of any action under this section, notice thereof shall be served upon the attorney general by the employee."); Robledo v. No. 9 Parfume Leasehold, No. 12 Civ. 3579 (ALC)(DF), 2013 WL 1718917, at *7 (S.D.N.Y. Apr. 9, 2013). Polit has not provided any evidence that the State Attorney General was served with notice of this suit. Absent this information, Polit's request for an award of damages for unlawful retaliation in violation of Section 215 is denied without prejudice. His counsel, however, is permitted to submit appropriate proof of service upon the State Attorney General within fourteen (14) days of this Order.

## IV.   Attorney's Fees and Costs

Polit seeks $19,003 in attorney's fees—$17,220 billed by his attorney, Justin S. Clark of Levine & Blit, for his work on this matter, as well as $1,783 in fees and filing costs. Mr. Clark has submitted contemporaneous time records showing that he performed 57.4 hours of services in this matter at a rate of $300 per hour. See Clark Time Records, Ex. L (ECF No. 56-12).

Both the FLSA and the NYLL are fee-shifting statutes, permitting a prevailing employee to recover reasonable attorney's fees from the employer. See 29 U.S.C. § 216(b); N.Y. Lab. Law § 198(1–a); Young v. Cooper Cameron Corp., 586 F.3d 201, 208 (2d Cir. 2009). Courts determine the "presumptively reasonable fee" for an attorney's services by looking to "what a reasonable, paying client would be willing to pay . . . who wishes to pay the least amount necessary to litigate the case effectively." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 184 (2d Cir. 2007). Reasonable hourly rates are determined by reference to, *inter alia*, fees in the community in which the action is pending and to "prevailing

16

market rates for attorneys of similar expertise providing comparable services." Siemieniewicz v. Caz Contracting Corp., et al., No. 11 Civ. 704 (JG)(JO), 2012 WL 5183375, at *15 (S.D.N.Y. Sept. 21, 2012) (internal quotation and citation marks omitted). "It is the fee movant's burden to establish the prevailing market rate." Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., No. 13 Civ. 2548 (KMW)(JLC), 2014 WL 1303434, at *8 (S.D.N.Y. Apr. 1, 2014).

### A. Reasonable Hourly Rate

Polit has requested an hourly rate of $300 for his attorney Justin S. Clark, who was admitted to practice in New York in 2013 and is currently a fourth year associate at Levine & Blit. Mr. Clark first began billing time for this matter in September 2014 as a first-year associate. Mr. Clark drafted the complaint and document requests, took depositions, and appeared before the Court. See Clark Time Records, Ex. L (ECF No. 56-12).

The Court finds that $300 is a reasonable rate for an associate with four years of legal experience at an employment law firm who has assumed much, if not all, of the substantive responsibilities of this case. See, e.g., Allende v. Unitech Design, Inc., 783 F. Supp. 2d 509, 514–15 (S.D.N.Y. 2011) (hourly rate of $300 for associates at "well-known and highly respected law firm" is "consistent with rates awarded by the courts in other FLSA or similar statutory fee cases"); Saunders v. City of N.Y., No. 07 Civ. 830 (SAS), 2009 WL 4729948, at *8 (S.D.N.Y. Dec. 9, 2009) (awarding associates between $200 and $300 per hour in an FLSA collective action); Gonzalez v. Bratton, 147 F. Supp. 2d 180, 211–12 (S.D.N.Y. 2001) (awarding rates ranging from $390 to $180 for the most senior to the most junior attorneys, although rates were acknowledged to be "at high end" for attorneys in a small firm). Accordingly, Polit's application for attorney's fees will be assessed at the requested hourly rate of $300.

### B. Reasonable Hours

In determining how much attorney time should be compensated, the Court first looks to the amount of time spent on each category of tasks, as reflected in the contemporaneous time records, and then determines how much of that time was "reasonably expended." Malletier v. Dooney & Bourke, Inc., No. 04 Civ. 5316 (RMB)(MHD), 2007 WL 1284013, at *1 (S.D.N.Y. Apr. 24, 2007) (citing New York Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1142–43, 1147 (2d Cir. 1983)); see also Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992) (the inquiry should focus on "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures") (internal citation and quotation marks omitted). The Court also has the discretion to make specific reductions or a reduction across the board where the number of billing entries is overly voluminous. See In re Agent Orange Prod. Liability Litig., 818 F.2d 226, 237 (2d Cir. 1987).

As reflected in his billing entries, the tasks completed by Mr. Clark were necessary to prosecute this action, performed within a reasonable amount of time, and were the type of work in which a reasonable attorney would engage. With regards to travel, however, Mr. Clark spent a total of 2.4 hours traveling from his office in midtown Manhattan to the Court in lower Manhattan. See Clark Time Records at 1–2, Ex. L (ECF No. 56-12). "In recognition of the fact that travel time may be beneficial, but probably is not as productive as time at the office or in court, courts in the Second Circuit regularly reduce attorneys' fees by 50 percent for travel time." Adusumelli v. Steiner, No. 08 Civ. 6932 (JMF), 2013 WL 1285260, at *5 (S.D.N.Y. Mar. 28, 2013) (internal citations and quotation marks omitted); see also Gonzalez v. Bratton, 147 F. Supp. 2d 180, 213 n.6 (S.D.N.Y. 2011) (collecting cases). Because there is no indication that Mr. Clark's travel hours have been reduced accordingly, the Court will reduce by half all of the

18

billing entries that include travel. Therefore, Polit's counsel's total hours have been reduced to 56.2 hours, and Polit is awarded $16,860 in attorney's fees.

### C. Costs

In addition to attorney's fees, Polit is entitled to "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." LeBlanc–Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998). Polit seeks $1,783 in court costs for filing, process server, and deposition fees. See Filing Fees, Ex. M (ECF No. 56-13). Upon review, the Court finds that the fees are reasonable and recoverable, and grants Polit's request for $1,783 in court costs in its entirety.

## CONCLUSION

For the foregoing reasons, Polit is awarded (1) $4,000 in unpaid wages for the period between January 16, 2013, to February 1, 2013, plus pre-judgment simple interest at a rate of 9% per year starting on October 16, 2013; (3) $4,000 in liquidated damages under the NYLL; (4) $3,960 for statutory wage and hour notice violations; (5) $16,860 in attorney's fees; and (6) $1,783 in costs, for a total award of $30,603 (exclusive of interest). Polit is directed to serve this Opinion & Order upon Global Foods.

The Clerk of Court is respectfully directed to enter judgment and close the case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED: April 13, 2017
New York, New York